Case number 23-1237 et al. Acumen Capital Partners, LLC Petitioner v. National Labor Relations Board. Mr. Pikus for the petitioner, Mr. Odetsky for the respondent. Mr. Pikus? Did I say that right? Is it Pikes or Pikus? It's Pikus, Your Honor. Pikus, sorry. Okay. Good morning. Lawrence Pikus with Wigan & Dana for the petitioner, Acumen Capital Partners. May it please the court. This appeal obviously arises out of a decision of the National Labor Relations Board, which in large part adopted a decision of an administrative law judge finding a violation of sections 8A1 and 8A3 of the Act, the National Labor Relations Act, in connection with Acumen's termination of the employment of Gregory Zapata. Our appeals premised on the board's decision being essentially predicated on a faulty foundation, a foundation that's really built on nothing more than speculation. So the framework for the analysis, of course, is the right-line test, which has three elements, only two of which are pertinent here, that the employer knew about the individual employee's protected activity under the National Labor Relations Act, and that that protected activity was a motivating factor in the employer's decision to take adverse action. And the board, the general counsel, did not meet her burden of proof as to either issue. The knowledge question, of course, the pertinent knowledge being a knowledge of the decision maker, in this case, that's Mr. Rosenblum. The board focused extensively on the knowledge of a non-decision maker, Mr. Coppola, without introducing any evidence whatsoever to indicate that Mr. Rosenblum was aware of whatever protected activity Mr. Zapata engaged in. We have numerous cases that say the knowledge of a supervisor is imputed to the employer in L&LB cases. Well, that's basically a legal fiction to establish knowledge, but ultimately there has to be... I'm sorry? Is Mr. Coppola an agent? The board found that he was an agent. An agent and a supervisor, and that his knowledge is imputed to the employer, and the employer is the one that fired Mr. Zapata. I don't understand how you can say the knowledge element wasn't met. Ultimately, perhaps this is better analyzed under the anti-anonymous aspect of the test. You said there were two fronts, so you talked about the first one, and that's what I'm asking about. Right. So do you disagree? Am I wrong about that? I thought we had a lot of precedent that said knowledge of a supervisor was sufficient. Well, I mean, case law speaks to the fact that ultimately the decision maker has to have some knowledge, and just because a low-level supervisor like Mr. Coppola had some discussions or a discussion with Mr. Zapata about the union's organizing activity, he asked him whether he was the one who brought the petition to the building, and Mr. Zapata said no. Do you have a case where a supervisor had knowledge? I think you don't dispute that Mr. Coppola had knowledge of the union activity, right? Yeah, actually, yeah, the union was trying to—originally, initially, they were trying to encourage him to vote for the union, so he was aware of the activity. No question there. Do you have a case where, because this would help me understand, because maybe I'm misunderstanding our precedent, and that is, you have a case where you said that's fine, but we don't impute the knowledge of a supervisor to the employer?  I thought you were saying that we had to have—cases say we have to have something more on the actual decision maker for knowledge. Right, so we cited the Flagstaff Medical Center versus NLRB case from this court in 2013, which was also dealing with the issue of imputed knowledge by a supervisor, and the court says is if the general counsel relies on circumstantial evidence and legal fictions about constructive knowledge, it does so to carry its burden of showing the decision maker knew about the employee's union activity, permitting circumstantial evidence and legal fictions to trump direct proof to the contrary is absurd, is what the court said. They had direct proof to the contrary. You had— Direct proof to the contrary that he didn't know? Well, first of all, you had Mr. Rosenblum's testimony, which was— I'm sorry? That was discredited. You haven't challenged that credibility determination, so— Well— What direct proof do you have to the contrary? I don't think his testimony that he was generally unaware of Mr. Zapata's involvement in the organizing campaign was discredited. There were certain aspects of Mr. Rosenblum's testimony that was discredited. In the organizing campaign, it's not the same thing as saying he did not reasonably suspect that Mr. Zapata was supporting the union, interested in having a union. All the board pointed to in that regard, Your Honor, is the conversations that Mr. Coppola had with Mr. Zapata, where Mr. Zapata denied being involved in initiating the petition. What happened from there was that the ALJ manufactured a conversation by saying that Mr. Rosenblum denied ever talking to Mr. Coppola about union activity. The only discussion they ever had was the petition came to Mr. Coppola for some reason, he gave it to Mr. Rosenblum. That was the last they ever discussed the union petition, according to the testimony of both of them. So they both denied having any conversation about Mr. Zapata, and the ALJ went and said, I don't believe you, and therefore they did have a conversation. Basically, manufacturing a conversation that there's no testimony or evidence existed. But just so we're clear, Rosenblum knew that there was union activity. It's not like Rosenblum didn't know that there was union activity. That's correct, Your Honor, because there was a petition filed in early February of 2022. And the petition could have been filed by how many people? At that point in time, I believe it could have been filed by any one of four, if you include Mr. Coppola, who initially was seen, at least by the union, as part of the bargaining unit. And at the time that Mr. Zapata was fired, how many of those four people were still with Acumen? At that point, I believe there were three, one left at the end of January. Mr. Coppola was still there. And then I believe it was Mr. Garcia ended up leaving, I think it was in mid-March. So there were three that were still there at that point in time. Shortly before the petition, Mr. Zapata had been in Mr. Rosenblum's office expressing labor grievances to him. And the ALJ and board relied on that as well, that when you have someone in your office just a couple weeks before complaining about working conditions, and then it's this tiny little group, as Judge Wilkins points out, weeks later, a petition appears. Well, it's interesting on the timing, because if you look at Mr. Zapata's testimony... The question is whether the board or ALJ can rely on that. I'm sorry? The question is whether the board or ALJ... You said they just made stuff up. There was other stuff in the record to point to. Right. I'm not saying that ALJ made everything up. I'm just saying that that conversation was manufactured. But you alluded to the timing. When Mr. Zapata was asked on direct examination about that conversation, which was initiated when he saw an Indeed ad for basically what he thought was his position at a much higher rate of pay. And he met with Mr. Rosenblum about it. He was asked when that took place. And his answer was mid-March, which was after his termination. And the counsel for the general counsel funneled him into... Well, you were already gone by then. Oh, well, late January. So the timing of it is a little bit uncertain, but... Are you disputing a fact-finding now? I'm sorry? Are you disputing a fact-finding by the board now? I don't believe the ALJ made any finding as to exactly when that conversation took place. Late January, two weeks before the petition. That's when he ultimately said it was. But if you look at that conversation, he talked about the Indeed ad. And then Mr. Rosenblum asked him a few questions about how he enjoyed his job. And then he talked about how with other employees, he thought there was a high turnover. We're not making the fact determinations.  We're not deciding what inferences to make from them. I've described to you what the ALJ and board did. We know that Mr. Rosenblum was aware of labor activity, union activity, that there was a That's kind of more likely to be. It's going to be one of them. Well, he didn't have a supervisor. And and so because the supervisor's been around, hasn't done anything like this. So there's Mr. Zapata. His only other only other full-time one at that point. Well, at that point, it was a full-time, part-time after. He was the only other full-time one. Right. He's the only full-time there. He'd just been in his office expressing grievances on behalf of the engineers. Again, we have a very deferential standard. I understand if the ALJ and board had gone the other way. That would be perfectly reasonable, too. But that's not the issue before us. Right. I use the term grievances, though. He was answering some questions for Mr. Rosenblum. His testimony was, after they got past the advertisement for the position, was that he told Mr. Rosenblum that he felt that there was high turnover because of the benefits that were being offered. You know why everyone's leaving. Those are your benefits and stuff. Yeah, you're not going to be there. Yeah, he was talking about other people, you know, not himself. But definitely not himself. He was just there for a pay raise. He wasn't supposed to get paid this much. You want to turn to the Animus issue? Sure. And the evidence of Animus, the primary bit of evidence that was cited as displaying Animus is the conversation from almost a year earlier during Mr. Coppola's job interview when Mr. Coppola, who was a lifetime or longtime union member, had always been a union member, asked Mr. Rosenblum about whether there was a union at the building. And Mr. Rosenblum said, this is a non-union building. Apparently, Mr. Coppola interpreted that to mean that he was not permitted or Mr. Rosenblum didn't want him to bring the union in. And that's how he ostensibly communicated that conversation to Mr. Zapata. What Mr. Rosenblum said is clearly an HC protected communication. He's simply stating that, at most, he's saying that we do not want a union in our building. That is exactly what HC is designed to protect. And keep in mind who he's saying it to. He's saying it to someone who the board has determined, the board advocated was, and successfully advocated, was a supervisor under the Act, meaning that Mr. Rosenblum and Ackerman had the right to demand complete loyalty from Mr. Coppola and tell him, if that was the message, do not bring a union in here and do not help employees unionize. That is perfectly lawful. Well, he didn't even say that. He said much less than that. I'm sorry, he didn't go that far. Exactly. It was even less than that. And there's no element of coercion to that communication. That's the kind of communication that happens every day in a workplace where there's union activity among management and their supervisory personnel. I think that's kind of the key argument that they advance, which really is foreclosed by Section 8C. The rest of it is largely just the ALJ saying, I don't like the way this played out. You know, the arguments about the vaccine mandate. I mean, Mr. Rosenblum testified that what changed was when the city fired over 1,000 people for not being vaccinated. Well, the general counsel says, well, they had put people on leave before that. There's no evidence Mr. Rosenblum knew about that. He certainly knew about the firings and acted based on that. You know, otherwise, you have this odd circumstance that it's pretty clear they weren't strictly enforcing this mandate until that time. And then Mr. Zapata in his office and Mr. Zapata says, look, I'm going to get it tomorrow. And having waited weeks and weeks and weeks and weeks, and the guy's going to have the vaccine and all he needs one vaccine to comply. He's going to have it within literally hours. Well, I don't care. All of a sudden, I don't care. Well, first of all, the only thing... Doesn't that allow for an inference that he wasn't really enforcing the vaccine mandate? He was looking for an excuse? I don't believe so. First of all, Your Honor, Acumen did everything in accordance with the mandate except fire people, right? And they were only, at that point, Zapata was the only one. No mandate to fire people. Well, to remove them from the facility. And Mr. Zapata... Well, it's a very different thing. Well, with someone who has no PTO left and is an on-site job, there's not really too many options. But I suppose they could have could have furloughed him. That's the one thing they could have done. But I mean... He could have furloughed him for half a day till he got a shot. Okay. Right. But at that point... You've waited all this time. He says, I didn't know you were enforcing this. I've got it tomorrow. What reasonable employer who's not looking to punish this employee wouldn't just wait for him to get the shot? Or when he gets the shot, say, all right, come back to work tomorrow. Well, a couple of things, right? Mr. Rosenblum sent him an email, asked him to come to his office with his vaccine card or an application for an exemption. Mr. Zapata came with neither. At that point, Mr. Rosenblum wasn't interested in the appointment because it had been several weeks. So keep in mind, when Zapata said that he was going to get the vaccine the next day, Mr. Rosenblum said, we'll reassess the situation after that. What evidence is there in the record that Mr. Rosenblum or Mr. Coppola told him several weeks earlier? Because you said it's been several weeks. He had to get that vaccine within a week or two or three. The posting said it. The December 27th posting. But they weren't enforcing that. There's evidence that it's not rebutted by Mr. Rosenblum, that Mr. Coppola was saying it's not being enforced yet. That lots of employees didn't. That same day, did he fire everybody who didn't have a vaccine or just Mr. Zapata? Yes, because Mr. Zapata was the only one. In the whole place? There were only about 17 employees. And everybody else had their vaccine or one employee had left, although I think he got vaccinated before that. Where does it say every employee had? There was a record that was being maintained by acumen of folks who provided their proof of vaccination. It's in the record. Zapata, at that point, was the only one who had not been vaccinated. So, you know, also in terms of, well, why not just wait a day? I think the Circus Circus case speaks to that same exact issue where the gentleman had not taken a mandatory medical exam and he insisted he had an appointment. He was going to get it the next day or thereafter. And this court said, well, agreeing to overcome the reason that you're being fired doesn't mean that the employee didn't hold a good faith belief that your termination was appropriate at that particular time. This case is really no different than Circus Circus in that respect. So, sure, Mr. Rosenblum could have done something different. He could have told him you're on leave until you give me proof of vaccination. I think he was skeptical at that point as to whether Mr. Zapata intended to get vaccinated. But we could have done what he did. Evidence that Coppola had said he would alert the engineers when Rosenberg was enforcing the vaccine policy. That was Zapata's testimony, yes. That was news to Mr. Rosenblum, according to his testimony, that he was. Did Mr. Coppola deny it as well? I don't, I actually don't know the answer to that, Your Honor. I don't believe, I don't believe Coppola was asked. Record to that effect. And of course, the small firm policy that the board applied, and all this was taking place right outside Coppola's office, which was in the boiler room. Well, we're not contesting that Mr. Coppola had some knowledge of the union activity that was going on. No, no, no, no, no. That wasn't my question. It was evidence that Mr. Coppola had told the engineers that he would let them know when Rosenberg was enforcing the vaccination policy. That's correct, there is that. And there's no evidence that they were ever told. There's no evidence they were ever told beyond what was in the posting, specifically said that you had to have the first dose by December 27th, 2021. But bear in mind, Mr. Coppola is allegedly making those assurances before anybody knows anything about union activity, before there's a petition on file, before the union rep shows up at the facility. So, that supports the board's position here. Well, not so, I don't think. The two were linked, and your argument is they weren't linked. Well, exactly, because if we're saying that this is- But you can't argue both sides, that's all I'm saying. You have to choose. Right, I think the point though, the critical point in terms of those supposed assurances, is they were pre-petitioned right there before anyone knows about union activity on site. So, in order for that to somehow suggest there's an illicit motive here, right, it would have to be almost like they're trying to set Mr. Zapata up. Set him up for what? Like, they didn't know there was any union activity. So, the assurances really don't tell us anything about Mr. Rosenblum's motive, at least in terms of anti-union animus. Nobody knew there was any union on the scene at the time these assurances are being provided. Otherwise, it doesn't really play into the analysis. The point is, it's essentially a pretext argument. What about the argument based on the evidence that Rosenberg communicated with the engineers through Coppola, and this was standard operating procedure? He did communicate through Coppola in regard to their day-to-day activities. So, isn't he subject to the fact that there was evidence Coppola didn't advise the engineers that Rosenberg was enforcing the policy? Right, there was testimony from Mr. Zapata that Mr. Coppola told him that he'd let them know when Mr. Rosenblum was going to be enforcing the policy. But again, those conversations all took place before the petition was filed. So, if he's doing that, either at Mr. Rosenblum's behest or not, to try and set this guy up for a firing, it certainly couldn't be because of union activity, because nobody knew that was going on. You say nobody knew. The board applied the small firm analysis here, and you haven't attacked that. Well, first of all, these conversations took place before the union even showed up at the union organizer came to the boiler room, which I think was late January. I know, but the union issue was on the table from the beginning of Zapata's employment interview. From a year earlier, there was some discussion with Mr. Coppola about the union. I mean, the small plant doctrine, what the board overlooked there, first of all, I've not seen a case where the board applied the small plant doctrine to establish an individual, a particular individual who was engaged in protected activity, as opposed to knowledge that union activity was in the works. But the elements of it, the only one that's met here is there's a small workforce. This is a huge building, 575,000 square feet, a full city block. Everything's going on in the boiler room. Right. Well, again, we're not talking about this. Where Coppola's office is. Right. I'm not doubting that. We're not arguing that Mr. Coppola had some knowledge here. The question is whether the decision-maker, Mr. Rosenblum, had knowledge. He's up on the sixth floor, nowhere near these guys. But the community case relies on Coppola. The board's case relies on— That's what the board said. Right, exactly. And if there's a question, that's documented in the record, is there? Right. And there's, I mean, it is undisputed that Mr. Coppola was not consulted on this discharge decision, was not involved in the discharge decision. So at some level, to establish anti-union animus, that has to point to Rosenblum. Because he's the lone decision-maker here. So Mr. Coppola, in communicating to Zapata that this is a non-union building, would you say that's a protected statement? That that's all to be ignored? That's correct, Your Honor. It is a protected statement. And when Coppola says to Zapata, it's either you or me? I'm not sure there's any real significance to that. Again— Well, he's saying either you instigated the union activity or I did. Well, there's— And Zapata says he didn't. Right, but there's nothing unlawful about making that inquiry. I mean, the board didn't bring an interrogation charge— No, I know, but we're talking about animus. A lot of innocent acts can show that there's a discharge decision. Complicity, that's all I'm getting at. And it's a little difficult— Consistently said you don't need direct evidence. It's a little difficult to imagine that a lifetime union member like Mr. Coppola harbored union animus, and then to impute that unanimous to Mr. Rosenblum based on what? No, no, no, no, no. You're mixing, and I suppose you're mixing quite consciously. That's not the position the board took. Well, the board did not— Certainly didn't identify any evidence of animus on Rosenblum's part. They worked through Coppola to try and establish that animus. So apart from the timing, which alone doesn't prove an illicit motivation, they looked at this HC protected statement, the fact that the city had put people on leave, that Rosenblum— There's no evidence Rosenblum knew anything about. And the issue that Judge Millard alluded to in terms of they could have done things differently by putting Mr. Zapata on leave until he actually got his vaccine, which is a matter of semantics. When Mr. Rosenblum told him when he got his vaccine, he would reassess the situation, and he was in the process of doing that, or at least considering it, and considering additional factors that came into play in light of Mr. Zapata's behavior in his office when Mr. Zapata said, I don't want my child back, and that was the last time anybody ever heard of him. So there's no evidence Mr. Rosenblum didn't follow through on at least considering bringing him back after he received his vaccine in compliance with the mandate. At that point, the board's case crumbles. There's nothing there to establish anti-union animus infected this particular decision. There's no evidence that afterwards, that after Zapata got the vaccination, Rosenblum refused to take him back. Well, he didn't refuse. There were some emails back and forth for about two days. Well, he didn't refuse. He didn't rehire him. Well, he didn't. No question about that, right? Well, he didn't tell him, I won't bring you back. The conversation ended when Mr. Zapata said, I don't even want my job back anymore, and he was never heard from again. No, that's after he sent three emails and Rosenblum never responded. He did not respond to all of those emails. I think he responded to all. So his silence, he wasn't reconsidering. He wasn't putting Zapata back. Anyway, I don't want to belabor this point because our standard of review here is so limited. Well, I certainly understand that, Your Honor, but this would be by no means the first case where the court concluded the board did not have substantial evidence to support a finding of a discriminatory discharge. The Sturm-Trotter case from just a few months ago, I think, is a good example of that that we've discussed. And I guess in our reply brief, it came out after our opening brief, I believe.  Any other questions, Judge Rogers? Thank you. Thank you. We'll give you a couple of minutes for rebuttal. Thank you so much. Mr. Odeski. Good morning, Your Honors. May it please the court. I'm Jared Odeski for the National Labor Relations Board. Substantial evidence supports the board's finding that Acumen violated the act by discharging Gregory Zapata. A reasonable mind looking at the credited evidence certainly could conclude, one, that Acumen's discharge of Zapata not two weeks after the filing of a union election petition was motivated by Zapata's union activity. And two, that Acumen failed to show that after seven weeks of noncompliance with the city's vaccination order and one day before Zapata's scheduled vaccine appointment, it terminated Zapata because it feared penalization by the city. So the board's order is entitled to full enforcement on this standard review. So starting first with unlawful motivation, the board's finding rested on two bases, both knowledge and anti-union animus. And as Your Honors acknowledged, with respect to knowledge, Acumen has conceded in its reply brief that record evidence supports the finding that Coppola knew of Zapata's union activity. That leaves two potential paths for finding that Rosenblum, the decision maker here, had One of those is the well-recognized doctrine of imputation, where Coppola's knowledge was imputed to Rosenblum. And under that doctrine, as established in Clark and Wilkins, a supervisor or agent's knowledge is imputed absent an affirmative basis not to impute it. And here there is no credited evidence to that effect. In addition, we have Rosenblum's own reasonable suspicion. Doesn't it matter kind of how high level the supervisor is? So with respect to the doctrine of imputation for knowledge, all of the cases that Acumen cites for that proposition deal with this junior supervisor concept in the context of animus. With respect to knowledge, there's nothing in the doctrine that actually says, well, a low-level supervisor or a low-level agent, that doesn't matter because it's expected that it can be communicated up the chain. But in addition here, we have significant evidence that actually buttresses the imputation of animus. We have daily conversations between Coppola and Rosenblum. Are you shifting to animus now from knowledge? I'm talking about knowledge. You said animus. Oh, I apologize. Yes, so for knowledge. So there's significant evidence buttressing the imputation of knowledge, the daily conversations between Coppola and Rosenblum about this very small engineering workforce, the fact that Coppola shared the union election petition with Rosenblum, and they had a conversation about it. And then there's also precedent for them talking about unionization in the context of the job interview. So it was a perfectly reasonable imputation based on both the doctrine, but also circumstantial evidence that supported it. Is there any evidence in the record as to what the conversation between Coppola and Rosenblum was? When you said they talked about the petition? Yes, so on JA-167, there is just a note that Rosenblum says, we talked about Coppola being on compliance. And so there's nothing more in the record. But essentially, in one point, Rosenblum said, well, we actually didn't talk about it. And then he separately said we talked about it. So we don't have any test evidence as to the content of that. Other than Rosenblum saying that Coppola was on compliance, but they did have a conversation about it. So we know that we don't have any basis for any even reasonable inferences about the content of that conversation. Well, we know that it's an easy question to ask witnesses at a hearing. And they didn't have the information. They didn't have the information. It's just an empty record on the content of that conversation. Well, based on the entirety of the evidence, we knew that Coppola and Rosenblum were having frequent conversations, had spoken about unionization before, which was another part of the You need knowledge of Zapata's union activity. And that's you need some evidence, something. So Coppola talked a lot that he would have had a reasonable suspicion, at least, that Zapata was involved in union activity. So we do have that with respect to Rosenblum's own reasonable suspicion, which he developed from the Indeed message and the conversation that they then had. So at the end of January, Did Mr. Rosenblum testify that based on that conversation, he developed a suspicion? No, but that was a perfectly reasonable inference for the board to draw. I'm not sure of that, Your Honor. But I do know that the board could reasonably draw the inference that if a conversation happened at the end of January regarding wages and benefits, and then several days later, a union petition comes forward. I also want to make a correction. At that point, there were only three potential engineers in the unit, one of whom was Coppola, a supervisor. You just have Garcia and Zapata at that point. It's a perfectly reasonable inference to think that Rosenblum had to suspect that Zapata was at least involved in this petition. So that independently establishes knowledge. But with respect to the imputation doctrine, I do just want to note that the different aspects I was talking about are all reasons that buttress the imputation. But the doctrine operates without any circumstantial evidence. If there is not affirmative evidence that imputation should not be implied, then it continues to go through. So next turn.  Is that what you're turning to? I'm turning to Animus. Yes. So with respect to Animus, the board relies on three pieces of evidence. So one of those is Rosenblum's statement that then gets communicated out to Zapata in some fashion. So in this conversation with Coppola, Rosenblum says that one of the terms of employment here is that this is a non-union building. Where did you say terms of employment? All I saw was the testimony that Coppola said, hey, I've been a union guy, what I do. And Rosenblum says, this is a non-union building, I think. Right. This is a non-union building. That's correct. Which is a factually accurate statement. So devoid of any context. Devoid of any context. In that precise context where the guy says, hey, I've been union, long time union, and this is a non-union building and says nothing more. And then on JA 125 and 126, Coppola does testify that Rosenblum then, in this context, told him the terms of employment. And this was also a job interview for Coppola. And so this conversation about, well, here are the terms of employment at the building. He said he interpreted it as a term. But he never said that there's no testimony that Rosenblum ever said this. Keeping it not, just one thing to say, it is non-union. But keeping it non-union is a term. Well, so this is how Coppola understood it. And that's evidence of what was happening in that conversation. It doesn't matter. He's a supervisor. It's perfectly fine to say that to supervisors. So there's two reasons. It's not anonymous to say something that's perfectly lawful to say to a supervisor. Sure. So one of the reasons is that even if Rosenblum thought that Coppola was a supervisor when he was hiring him, he was hiring him as the chief engineer. And the record is clear. He was or was not a supervisor as a matter of law, all right? And the board's held. And there's no contest here that he was a supervisor. Sure. It was perfectly lawful. What he said was perfectly lawful to say to a supervisor. So how can that be? What is your best case that a perfectly lawful, factually accurate statement, as narrow as this is a non-union building, to someone to whom he's allowed to say that? So it's the cases. Sorry, Your Honor. So it's the cases where the employer intends for that statement to be communicated out from the supervisor to employees. So here. There's evidence of that. He intended that. So he hired Coppola as chief engineer, tasked him with onboarding employees and communicating directives from him, which is clear. And then Rosenblum, when he spoke to the engineers, or Rosenblum, when he spoke to Zapata, said the building was not a union. Not that this position. But he didn't respond to a question from Zapata. He didn't do it as part of the onboarding process. Zapata asked, and he responded. And that conversation. It's different than a directive as part of your onboarding process to tell everyone this place is non-union. So it was early in Mr. Zapata's employment. And the conversation was essentially Mr. Zapata saying, how come we're not union? And then Coppola explains the barrier. Because Rosenblum didn't want it in the building. Coppola, in fact, had wanted to be union. But he explained the reason we're not union is because Rosenblum doesn't want it in the building. And that's his interpretation of what Rosenblum said. And that is the coercive statement that he communicates out. That's from Coppola. It's not from Rosenblum. That's from Coppola. I could be totally wrong about all that. Well, Coppola, it was taking a conversation from context with Mr. Rosenblum. And under the board's standard for determining whether something is in a place that's analogous to that, that you have all Mr. Rosenblum said is this is a non-union building to someone who's a supervisor. Perfectly lawful. And then how many weeks, months later? About eight or nine months later. Nine months later. Yes. In response to a question. So not as part of onboarding. In response to a question, the supervisor says, this is my interpretation of that conversation. And that counts as evidence of animus on the part of Mr. Rosenblum. What is your best case for that? So I think I would point your honor to Edelveon Chocolate Company, which is a board case, which talk any circuit precedent you can point to. I've been happy to supply a host argument letter to the court on that point. I do think the board has lots of cases. I mean, the board did it here, so I don't need a board president. Sure. That's your one thing. What else do you have? Yes. So also, there's Coppola's accusation to Zapata. But that's not evidence of Mr. Rosenblum. So I think here, the acumen cites all of these cases with respect to him being a junior level supervisor. I think that's a red herring here. He's not the junior level supervisor. This is a 13-person workplace. He's the supervisor for the engineers. For Animus, we have said that there needs to be, I mean, it's the cat's paw theory that's used in employment cases of all variety, that there needs to be some evidence that it was communicated to the decision-maker, Animus. Here, that evidence is circumstantial. Again, Coppola and Rosenblum— Is there any evidence that this, was it you or was it me, was communicated to Mr. Rosenblum? Well, the timing of it is one. It comes after the union petition. And he comes— Every conversation happens after the petition, we're going to assume, was conveyed to Mr. Rosenblum? No, but I do think that with respect to, you know, that he delivers the petition to Mr. Rosenblum. You've got no evidence. The problem is you've got no evidence. You keep pointing to Mr. Coppola, but there's no evidence that his Animus was communicated to Mr. Rosenblum, who only, the only thing you have that he did was a year and a half or two years earlier said to Mr. Coppola, the factually accurate and legally authorized statement, this is a non-union building. That's all you got. So, I think that the fact that Coppola, you know, is talked about by Acumen as a lifetime union member and then suddenly is confronting employees about this had to be either you or me and accusing them is circumstantial evidence that either some directive was coming from above or that he was communicating something upwards, uh, negative with respect to the union. But I think that the first one is more likely inference, um, that the board of draws here that there is between the statement and this accusation evidence. But there's, I don't understand why that one is even, I don't know why it's even reasonable to think it came from Mr. Rosenblum as opposed to Mr. Coppola wanted to make sure it wasn't, no one was thinking it was him that did it. He does have a job limitation on it. I mean, he thinks it's part of his job requirements. I would contrast here from the cases that Acumen cites where junior level supervisors have not been, uh, their animus could not be imputed upwards. So, Selco, um, was a case where there was a statement of a supervisor at a single Verizon store in Brooklyn that the board had then said could show animus of Verizon HR. And Nico was a case with their statements of two supervisors at a 785 person plant. And there they said this couldn't show animus by the HR management. This case is different. Again, it's a 13 person workplace. Coppola and Rosenblum are meeting every day. And you're just taking the constructive knowledge rule and moving it over to animus, which we haven't done. In this, all you're doing here is constructive knowledge because there's nothing other than surmise. I would draw a distinction between, I would draw a distinction between constructive knowledge, like the imputation doctrine, where there actually does not need to be affirmative circumstantial evidence. And here, where there actually is affirmative circumstantial evidence, yes, we don't have direct proof that Coppola had a conversation with Rosenblum, that Rosenblum had a conversation with Coppola that was infected by animus or where he was directed to make this accusation. However, we know that they were having these conversations every day. They ate lunch together every day. And there's a lot. We know we had these conversations every day. It's a reasonable inference for the board to have drawn. We just don't have to have any evidence. They just go, well, this is what I think. What, drawn from what facts? You have to have facts to draw it from. The fact that they had lunch every day means we can assume they were talking anti-union smack during every lunch. Again, I would point to the fact that they had a conversation at the inception of Coppola's employment regarding unionization, that the petition was shared. I think the collective evidence points to the fact that there was animus here. And the petition to the boss guy. Of course, you had to send that to him. That's not suggestive of anything. And the board said it was unreasonable to think that during that conversation, because we know that Coppola had knowledge of Zapata's union activity, nothing at all was mentioned. Again, this isn't knowledge about the union activities. You've got to show animus, that the animus, that either, put aside the questionable proposition that Coppola himself had anti-union animus given his history, but that somehow he had animus and that animus infected information that he gave, that he sort of used that to feed the decision maker, information to cause him to be fired. If we knew that Coppola had anti-union animus, which we do from this statement. That's not an anti-union animus. I don't want to get in trouble with my boss. That's not anti-union at all. This had to be either you or me. Yeah, because his interpretation of a conversation many, many, many months before was that it's a condition of his employment that it's a non-union, it's a non-union place. He's non-union, I guess. I don't know why we would infer without any other evidence that the employer was breaking the law and saying, and don't you let any union in here. It's just a lot to infer that someone went from an accurate and lawful statement to an illegal one, which would suggest animus. So I just don't know how you're getting the animus, even if we say Coppola had animus, which is a stretch given his history, as opposed to fear about losing his job. How do we get that animus up to Mr. Rosenblum? So under Parsippany Hotel, this circuit has said that something that would be an 8A1 violation under the act is evidence of animus. And so when we look at what— I said an 8A1 violation to ask whether someone's involved in the union. I thought employers could do that. So one, I would classify this as an accusation here, essentially saying it had to be either you or me. Coppola knew it was not him. It was an accusation against Zapata that he is the one who brought the union in. And second, when it comes to asking employees— Get me to the decision-maker having animus. That's the gap. Even we give you that. Sure. I think there's different interpretations, but even we give you and the board that because of our deference, how do we get animus up to Mr. Rosenblum? So if Coppola had anti-union animus, he's the only source of information that Mr. Rosenblum has with respect to any information about employees' vaccination, any information about unionization. You think he doctored the records? I don't— I'm not saying he doctored the records, but I do think he— He just gave him the COVID records that he had that were accurate. That's not feeding him information driven by animus. Any information with respect to any of the work of the engineers was being communicated upwards from Coppola to Rosenblum. And so I think it was fair for the board to infer that if Coppola had animus, it was either coming from above or it was being communicated upwards in some way. Let me ask you, counsel. I thought the evidence was that Coppola, when he was hired, had been a union man for a long time. And he's told by Rosenberg, this is a non-union building. That's correct. I didn't know that the board's argument or position was that it was relying on any anti-union animus of Coppola's. I thought the argument was Coppola was told when he was being employed that this was a non-union place. He became the supervisor. He knew about this union activity after Zapata came on board. He said, you know, did you do this? And Zapata said no. All right. So I thought the argument was, well, at most, Coppola knew Zapata was lying. Because there was nothing that Coppola himself had done to evidence any anti-union bias. And as Judge Millett's questioning has emphasized, Coppola was merely doing his job as he interpreted Rosenberg's statement about, this is a non-union building. And a reasonable inference from that, I thought, was that this is, and I'm hiring you. And there's nothing to say that Rosenberg was neutral on unionization. So Coppola is doing his job. He's interpreting what Rosenberg said. And the gap here may be that there's no evidence that Rosenberg knew that Coppola was conveying this to new employees in terms of, this is a non-union building and it's going to stay a non-union building. And if you're going to be supervisor, be sure you make that clear to everyone. I thought originally that was a reasonable inference, since Rosenberg's standard operating procedure for communicating with the engineers was through Coppola. So to the extent that Rosenberg had any idea what was going on, it was coming from Coppola. And there's nothing to say that he had any concern about how Coppola was interpreting his position. But Rosenberg knew from speaking directly with Zapata, that Zapata was concerned about a lot of benefits that didn't attach to his job. So then we've got this city directive. Nobody's enforcing it so far as the engineers are concerned. Coppola says, I'll let you know when Rosenberg's enforcing it. Then we have this sort of inexplicable fact of if Rosenberg was enforcing it, looking at what the city was doing, why would he ignore Zapata's offer that he had an appointment the next day to get his vaccination? So there's no evidence that Zapata was an unsatisfactory employee. So what's the exclamation for this harsh treatment? And so the answer in part is, well, he said he'd reconsider it. But when Zapata sent him those three emails after he got the vaccination, Rosenberg never responded. And at that point, Zapata said, well, I don't want my old job back. So this court is getting tougher and tougher on anti-union unanimous evidence. And we keep reversing. So this comes, the board's decision before a lot of these reversals by our court. So that's where we are now. And that's, I think, what you're hearing in a lot of our questions. Sure, Your Honor, and I think your characterization of the case overall is excellent. Excellent. I would next turn for animus to timing, which I think your question brought up. So I think perhaps one of the key pieces of animus here is that within two weeks of the filing of the petition and three weeks before the union election, we have the firing of a known union supporter, which is on its face suspicious and gives rise to an inference of animus. Now, of course, the inference of animus here is rebuttable by an employer's explanation that it would have taken a different action. And it doesn't matter whether this happens at stage one of the analysis or stage two of the analysis, because either way, we already have an inference that timing creates. And so all the board has to do is consider the employer's proffered explanation and dismiss it. And here the board found no alternative explanation that explained Zapata's discharge. And so moving on to the proffered explanation, Acumen says it fired Zapata because it feared penalization by the city. And the board concluded that this was not a fear that Rosenblum reasonably held for a number of reasons. One, Acumen had never seemed to fear city enforcement before in the prior seven weeks, during which time it had no reason to think that the city would not be enforcing the policy. It repeatedly told employees it wasn't enforcing it. And it said it would alert employees when it actually began taking it seriously. When the city terminated its own unvaccinated employees, it was no indication this was a harbinger of enforcement against private businesses. And, of course, Zapata had a vaccine appointment for the next day. The court has no... Did that amount to a finding by the board that Rosenblum's stated reasons for determination were a pretext? That's correct. And it did that pretext analysis. It characterized that proffered reason as pretext at the second stage. So do you have authority that timing plus pretext is sufficient to prove animus? That's right, Your Honor. So we do in this circuit. It has been held that timing alone is sufficient for a finding of animus. So that is with the Inova Health Systems case from this circuit in 2015. And Sturm Produce, which Ackerman points to, is just one case where it said, well, timing here alone is not enough. But this court has held that timing alone can be enough as evidence of animus. And then pretext on top of that is additional evidence of animus that the court can consider. The court has no further questions. The board respectfully requests full enforcement of its order. No questions, Judge Rogers? No, thank you. Thank you very much. Thank you. Mr. Pegas, we'll give you two minutes. Thank you. I'm not sure where those cases came from. But I mean, it's pretty clear that timing alone, and you talk about timing plus pretext, yes, but timing alone is not going to be enough to establish a prima facie case. But where is, again, the evidence of pretext here? What was just recounted, of course, we had a long discussion about Coppola's conversation with Zapata. Let me just begin there, because I think that's an interesting point, which is, first of all, the question was, it had to be you or me. The comment was, it had to be you or me that brought the petition to the building. Where does that evidence anti-union animus on the part of someone who is a lifetime union member, or really anybody? It's a simple inquiry. And as a supervisor, the company can, through its supervisors, it's not precluded from making inquiries about union activity. It's precluded from discriminating against people for engaging in union activity. The company has a right to know what's going on in its workforce. But this was a pretty harmless comment, more like a joke. The problem for you, in my view, is the pretext finding. When we try discrimination cases, the standard jury instruction that I used to give as a district court judge was, you know, to guide the jury. It's like, well, if the employer says that they fire someone for stealing pencils from the supply room and taking them home, and that's their grounds for whatever the adverse action is. And technically, there is a policy that says you can't remove company pencils from the site. But they know that everybody is taking pencils home, and they only discipline Susie for doing so. Then you can reasonably, you don't have to, but you could reasonably conclude that the grounds that Susie took pencils home was a pretext for the adverse action. That's just, you know, kind of common sense. In here, if the board credited that the policy conveyed by Supervisor Coppola was that we're not really enforcing this vaccine mandate, and I'll let you know when they do start enforcing it, and so that's the policy. And yet, all of a sudden, they depart from that policy to terminate Zapata, at least that's the way that the board saw it. Then they are either departing from their policy, or they're kind of using that policy as a pretext, and that's the board's finding. So why isn't that pretext finding supported by substantial evidence? Well, when you're talking about pretext, you're talking about pretext for what? Pretext to cover up discriminatory motivation. So in your example, in the, let's call it a gender discrimination case, I don't want to make too many assumptions, but since you used an employee named Susie was the only one who was terminated for taking the pencils. Well, suppose Jill and Joan and 10 other females did the same thing but weren't fired. That would eliminate any notion that there was gender-based discrimination going on, because Susie must have been singled out for some other reason. Same thing here by analogy, pretext for what? But the board is required to prove it's a pretext to cover up anti-union animus. If Mr. Coppola is providing assurances of non-enforcement before there's any union activity on the building that anybody knew about, whether it's Coppola or Rosenblum, so this is late December, early January, that he's telling people, Jeff is not enforcing it yet. Mr. Rosenblum is not enforcing this yet. I'll tell you when he does. How could that be evidence of anti-union animus when the union was not on the scene yet? I don't think that that timing undercuts the board's finding at all. The point is that that's the policy. If anything, that timing hurts your position, because if that's the policy, and then all of a sudden it's not the policy anymore after the company finds out that there's union activity, then I think that makes it worse for you. I would see it differently, Your Honor. First of all, of course, we're still talking about Coppola here, not Rosenblum. There's no evidence that Rosenblum issued that directive to Coppola. Rosenblum's suddenly the one that changed the policy. I'm sorry? Rosenblum suddenly changes the policy. That's right. And what the board ignored is the intervening event, as though it didn't happen. No, there's two possible intervening events. One was he read an article, or part of an article, but didn't read all the information. Or two, that the intervening event was the petition. One of those two was the intervening event, and the board said, we think it's the latter. Right. I mean, that's the sequence of events. That's the chronology, right? But we still get back to the same, you know, funding. An employer comes up with a false reason for getting rid of somebody, which is the board's finding. I'm not, I understand that's not your client's view, but taking the board's determination here, that that's a factual determination, whether it's false or not, finds a false reason, plus timing. So the fact that someone manufactures a reason for discharge, which on his face doesn't make a whole lot of sense when he was getting the vaccine the next day. If he stood in the office and said, I refuse, I refuse, it'd be one thing. He's a longtime employee here, no objections to his work. You're running out of engineers, as it is. And they say, no, I can't wait another 12 hours for you to get your vaccine. And they say that that is itself lying as evidence of animus, too, combined with the timing is what the board's rationale is. What's reticent that suffice for animus? I understand your point. But the directive from Mr. Rosenblum to Ms. Zapata was come to my office with your vaccination card or your request for an exemption. He didn't get that. Now, one can quibble or argue whether he treated him fairly. He got an appointment. I'm sorry? He got an appointment. He said he had an appointment. He took door number three. I guess your point is he was given two doors and he tried to create a third door. Well, I mean, Mr. Rosenblum asked for one of two things. He got neither, right? So, again, could... He was afraid New York City was going to come break down his door that afternoon and say, you only got one employee out of compliance, and you can say he's going to get his vaccine tomorrow, that they were going to throw him in jail and find the company. He just read that the city had literally fired a thousand workers for not being vaccinated. He has New York City departments as tenants in his building, including the NYPD. Did he know they were going to knock on his door that day or the next day? The NYPD wasn't running around enforcing this thing. I'm sorry? It doesn't make... I don't even understand that rationale. I've got other people in the building. I don't understand that rationale. Well, he was concerned if the city was enforcing it against its own employees, that his building might be a target because they have city tenants. It would have to be a target, like, within hours. Not necessarily. Because as of the next day, he's going to be in full compliance when Zapata gives his vaccine. He certainly had questions in his mind as to whether Mr. Zapata was being sincere about getting the vaccination at that point. That's what he's saying. So he decided to... You only got to wait a few hours for that. You only got to wait a few hours to figure that out. Fair enough. He could have done this differently. If he was a lawyer, you wouldn't have told him that you're going to get enforced and they're going to fine you or anything when you've got 99% compliance and the one person who wasn't is actually getting vaccinated within hours. Right. Again, I'm not here to argue that this was the only way to go. Our position is that right, wrong, fair, unfair, there's no evidence that is in this record that would allow for the conclusion that Mr. Rosenblum, as the decision maker, harbored discriminatory animus. It's really just a timing case and timing doesn't do it. It's also based on information that there's no evidence Rosenblum had about what the city was doing before they started firing people. The board asked the court to take judicial notice of something. There was no evidence Rosenblum ever looked at or read or had any idea that people were being, I guess, put on leave or whatever the city was doing before February 14th, I believe it was, of 2022. So, you know, it's kind of inference upon inference upon inference, but it really doesn't get to his animus and certainly Coppola's conversation with Zapata doesn't get him there. And I think Your Honor was 100% correct about the protected nature of Rosenblum's conversation with Coppola, which doesn't really get the board very far. Any other questions, Judge Rodgers? No, thank you. Thank you. Thank you. Appreciate it.
judges: Millett; Wilkins; Rogers